## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| ROGER W. MOSCATER, | |
| Plaintiff, | CIVIL ACTION NO: |
| v. | |
| HARTFORD HEALTHCARE CORPORATION, | MAY 28, 2024 |
| Defendant. | **JURY TRIAL DEMANDED** |

## COMPLAINT

The Plaintiff, Roger W. Moscater (hereinafter, "Plaintiff"), by and through the undersigned counsel, Carey & Associates, P.C., files this Complaint against the Defendant, Hartford Healthcare Corporation (hereinafter, "Defendant"). Plaintiff alleges as follows:

## PRELIMINARY STATEMENT

1.    Plaintiff's Complaint asserts claims for: (1) discrimination based on age in violation of the Age Discrimination in Employment Act (hereinafter, "ADEA"); (2) discrimination based on age in violation of the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. §46a-60(a) (hereinafter, "CFEPA"); (3) discrimination and retaliation based on disability in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*, (hereafter, "ADA"); (4) discrimination and retaliation based on disability in violation of the CFEPA; (5) interference and retaliation in violation of the Family Medical Leave Act, 29 U.S.C. § 2601 *et. seq.*, (hereafter, "FMLA"); (6) interference and retaliation in violation of the Connecticut Family and Medical Leave Act, Conn. Gen. Stat. § 31-51kk *et seq.*, (hereafter, "CTFMLA"); (7) intentional infliction of emotional distress; (8) negligent infliction of emotional distress.

1

## PARTIES

2.    Plaintiff, Roger Moscater, is a resident of the State of Connecticut. All of the Plaintiff's

work for the Defendant was performed in Connecticut.

3.    Defendant Hartford Healthcare Corporation is a domestic company with its principal

place of business in Hartford, Connecticut. Hartford Healthcare at Home, Inc.

("HHCAH") is a domestic company with its principal place of business in Wethersfield,

Connecticut. HHCAH is a wholly owned subsidiary of Defendant. Plaintiff performed

work for both Defendant and its subsidiary HHCAH and at all relevant times Plaintiff

was employed jointly by Defendant and its subsidiary HHCAH who were joint employers

of the Plaintiff. At all times relevant to this Complaint, Defendant conducted business

within the jurisdiction of this Court.

## PROCEDURAL PREREQUISITES

4.    On October 17, 2023, Plaintiff filed a "dual charge" of discrimination against Defendant

with the Connecticut Commission on Human Rights and Opportunities (hereinafter,

"CHRO") and the United States Equal Employment Opportunity Commission

(hereinafter, "EEOC").

5.    On February 29, 2024, the EEOC sent a Notice of Right to Sue letter regarding Charge

No. 523-2024-00220 to the Plaintiff. (Exhibit "A").

6.    On April 3, 2024, the CHRO sent a Release of Jurisdiction regarding CHRO No.

2420139. (Exhibit "B").

7.    Plaintiff exhausted all administrative remedies with respect to his claims concerning

discrimination because of his age and race under both Federal and Connecticut law.

## JURISDICTION AND VENUE

8.    Plaintiff's claims pursuant to the ADEA, ADA, and FMLA raise questions of federal law.

9.    This Court has jurisdiction over the ADEA, ADA, and FMLA claims pursuant to 28
U.S.C. § 1331. This Court has supplemental jurisdiction over Plaintiff's remaining
claims, including those under the Connecticut Fair Employment Practices Act § 46a-60,
*et seq.*, which arise from the same case or controversy, pursuant to 28 U.S.C. § 1367(a).

10.   The District of Connecticut is the appropriate venue for this matter pursuant to 28 U.S.C.
§§ 1391(b)(1) and (2), as the unlawful conduct complained of herein took place within
the District of Connecticut.

## FACTUAL ALLEGATIONS

11.   Plaintiff resides in Fairfield, Connecticut.

12.   Plaintiff's date of birth is XX XX, 1945, and he is 78 years old.

13.   Hartford Healthcare Corporation ("Defendant") is a corporation located at 100 Pearl
Street, 2nd Floor in Hartford, Connecticut, 06103. It is registered to do business in
Connecticut with the Connecticut Secretary of State. Plaintiff was hired by United
Visiting Nurse Association ("United") on September 15, 1990, which was acquired by
Visiting Nurse Services of Connecticut ("VNS") on July 1, 2005, and in turn acquired by
Defendant on February 27, 2019, which became part of the Defendant's homecare
division, HHCAH.

14.   Upon information and belief, Defendant is a federal contractor as they are a Medicare
health provider with more than half of its revenue coming from Medicare.

15.   On February 28, 2023, Plaintiff was abruptly terminated on a Zoom call. Plaintiff's last
day employed and the date all his benefits ceased was March 15, 2023. Plaintiff was

wrongfully terminated from his employment based on his age and disability.

16.    Plaintiff's termination occurred approximately three workdays after he informed his supervisor, Pat Kleinman, that he needed surgery. The surgery took place on March 27, 2023. Ms. Kleinman never informed Plaintiff that he was eligible for FMLA leave when he notified her of his need for surgery. Upon Plaintiff's termination, he was immediately cut off from his laptop and lost access to his work emails making it very difficult to respond with specific dates and times to the false accusations in his 2022 performance review and Performance Improvement Plan ("PIP") reports.

17.    Plaintiff served as an officer and combat veteran in the U.S. Marine Corps from January 2, 1968, to January 15, 1971, achieving the rank of Captain. While Plaintiff served in Vietnam, he was exposed to Agent Orange and was subsequently diagnosed with ischemic heart disease leading to a multiple stent placements, renal insufficiency, diabetes, hypertension, hyperlipidemia, and hyperthyroidism as a result, which have been confirmed by the Veterans Administration.

18.    Plaintiff's VA disability is primarily ischemic heart disease caused by Agent Orange exposure in Vietnam. Plaintiff had two heart attacks, the first in 2006 and the second in 2008 while working for VNS. As a result, Plaintiff has four cardiac stents. Plaintiff was on FMLA leave both times. The FMLA leave for those illnesses is documented in his personnel file, so Defendant had notice of his disabling conditions.

19.    Plaintiff worked in the home healthcare industry for almost 33 years continuously through two mergers. No new employment applications were needed. From 1990 to 2005, 15 years, Plaintiff was the Controller of United, the third largest home health agency in Connecticut at that time. In that role, Plaintiff performed all financial functions

of United, which included setting up the entire Great Plains General Ledger System, coordinating the annual audit with their external auditors, managed the annual budget, and issued all internal, external and government financial reports while supervising a staff of three.

20.    When United was taken over by VNS, the second largest home health agency in Connecticut, Plaintiff came over as the Budget and Internal Audit Manager reporting to the Vice President of Finance. For 14 years, Plaintiff received performance reviews of "Exceeds" or "Meets Expectations" every year. When VNS was acquired by Defendant, Plaintiff looked forward to contributing his experience to the largest home health agency in Connecticut.

21.    In February 2019, Defendant acquired VNS, which became part of the Defendant's homecare division. The Vice President of Finance of VNS, Ed Nicolas, and the Controller of VNS, Ben Mazotas, both left the Company as a result. For the remainder of 2019 and 2020, Plaintiff was very instrumental in transitioning the financial statements and records of VNS into Defendant's. In addition, Plaintiff completed the VNS budget for consolidation into Defendant.

22.    On November 6, 2019, Plaintiff was proud to be one of approximately a dozen Vietnam veteran employees of Defendant honored for their service and presented with a Vietnam 50th Anniversary Commemorative Lapel Pin by the President and CEO of Defendant, Jeffrey A. Flaks and a Certificate of Accomplishment signed by U.S. Senator Christopher S. Murphy for "Your upstanding presence as a veteran and work in finance at Hartford Healthcare . . ." at a ceremony held in Hartford.

23.    In March 2020, employees of Defendant began working at home due to Covid-19.

Plaintiff began reporting to Pat Kleinman, Finance Manager, in mid-2020. Ms. Kleinman is about 70 years old. When Plaintiff was first informed that he would be working for Ms. Kleinman, she asked him if he might have any problem working for her. Plaintiff responded, "No." Then, she asked him what his long-term goals were. Plaintiff told her that he enjoyed what he was doing and wanted to contribute as much as he could to the department in the long-term.

24.     Veronica Lugo and Plaintiff had many conversations about working for Ms. Kleinman. Plaintiff asked Ms. Lugo several times if she had problems understanding Ms. Kleinman's instructions. She confirmed that she did also. There were times when Plaintiff thought he was following Ms. Kleinman's instructions and later found out that was not what she intended. Ms. Lugo had many similar experiences. Ben Mazotas did not like working for Ms. Kleinman at all. He left shortly after VNS was acquired by Defendant.

25.     By 2021, VNS was fully absorbed into Defendant, and Plaintiff worked exclusively on Defendant's work. Plaintiff produced the daily statistical reports, assisted in the month-end financial closing, and worked with Ms. Kleinman on the 2022 budget.

26.     In or about the early summer of 2021, Covid-19 vaccines were mandated. On July 27, 2021, Plaintiff requested a religious exemption from the Covid-19 vaccine, which was granted by Defendant. Exemption requests had to be submitted directly to the Employee Benefits and Services Department. All managers who had employees reporting to them were notified whether their staff members had received the shot or had requested an exemption and asked to follow up on their status. As a practicing Catholic, Plaintiff opposes the current Covid-19 mRNA vaccines and Jansen vaccine, which are produced

with aborted fetal cell lines. Plaintiff could not according to the Catholic Church's tenets on conscience, use any product that takes its origin in abortion. As a result, Plaintiff had to test for Covid-19 for 52 weeks and submit his samples to Wren Labs in Branford, Connecticut, as required by Defendant. Plaintiff made sure he always submitted his test samples on time. Defendant sent the test materials to Plaintiff's home without issue. In addition to Plaintiff's religious beliefs, he could not risk getting the Covid-19 vaccines, which were not FDA approved, as a Vietnam veteran exposed to Agent Orange with the health issues he had, particularly the heart condition as discussed above.

27.     Shortly after Plaintiff submitted his exemption request, Ms. Kleinman asked him if he planned on getting the Covid-19 vaccine. Plaintiff told her he did not want to get the vaccine and had requested an exemption. She said she also did not want to get the vaccines either and asked Plaintiff what type of exemption he was requesting. Ms. Kleinman had no right to ask or know Plaintiff's reasons. However, because she was Plaintiff's superior, he told her the basis of his exemption request was due to his religion. In response, she stated that she was fairly sure that she could not get medical exemption but did not feel comfortable about getting a religious exemption for herself, so she got the vaccine. Plaintiff questioned to himself as to why Ms. Kleinman asked him.

28.     When Plaintiff initially began working with Ms. Kleinman, he streamlined the Monthly Statistical Report in such a way that it required much less maintenance to update by using a series of lookup functions. Plaintiff introduced a daily spread technique for all budget statistics, which more closely resembled the actual for better comparison. He set up Defendant's ability to obtain their Medicare Provider Statistical & Reimbursement System Reports ("PS&R") online by signing on as their Security Officer. This enabled

them to provide management with this report on demand as well as supplying it to the auditors for their preparation of the Medicare Cost Report. In mid-2020 their department was required to provide daily operating statistics to upper management. Plaintiff normally began working between 6:30 a.m. and 7:00 a.m. to ensure that these statistics were issued timely and accurately. It was not unusual for Plaintiff to work through lunch or after 5 p.m., if necessary. In four years, Plaintiff never took a sick day. Plaintiff's first performance review by Ms. Kleinman was in September 2021, and he was rated as "Exceeds Expectations."

29. The Budget process for 2023 started around March 2022 and continued into the summer. As far as Plaintiff knew the 2023 budget was going smoothly. Plaintiff understood the company was ahead of schedule and ahead of the previous year. Plaintiff did not notice any behavior changes from Ms. Kleinman during this time that indicated any issues with his work. To the best of Plaintiff's recollection, he had no in person contact with Ms. Kleinman from the time he began reporting to her in 2020 to September 2022.

30. In early September 2022, Ms. Kleinman informed Veronica Lugo and Plaintiff that another department was going to move into their work area in the Bridgeport Office and they would be moved upstairs. This was the first time Plaintiff had seen Ms. Kleinman in person in over two years since he reported to her. On September 13, 2022, Ms. Kleinman, Veronica Lugo, and Plaintiff met at the former VNS Office in Bridgeport to clean out their office area and move upstairs. Ms. Lugo is a Staff Accountant who came over from VNS. She is 61 years old. Ms. Lugo and Plaintiff were the only finance employees remaining from VNS in September 2022. They moved to two secretarial desks on the second floor outside of the former VP of Finance's office.

31.    Plaintiff no longer had an office. There had been some talk of them permanently working from home. Since then, Plaintiff felt underutilized as if they did not want to give him more responsibilities because they knew he would not be there much longer but he had no intention of retiring. There was never any talk of going back to the office from home. Plaintiff felt isolated from any of the operations, unlike his time with VNS where he worked with the operating managers on a daily basis.

32.    Approximately two to three weeks later in October 2022, after the 2023 budget process was completed, Plaintiff was surprised and extremely disappointed to receive a performance review of "Does Not Meet Expectations." Plaintiff was told that this was due to errors in certain monthly reports and that "[Plaintiff] did not take the lead in the budget process."

33.    Plaintiff felt that the criticism that ""[Plaintiff] did not take the lead in the budget process" was unfair in that he was following Ms. Kleinman's instructions. Plaintiff responded in a rebuttal at the time of the review. Plaintiff's rebuttal was as follows:

    a.    I was extremely disappointed with my performance review this year. To go from "Exceeds Expectations" last year to "Does not Meet Expectations" this year I believe is not a fair rating. [Ms. Kleinman] said that I am not performing at a manager level and that I was unable to perform at that level in the budget process. I thought that I performed all parts of the budget that [Ms. Kleinman] requested. Can [Ms. Kleinman] clarify what leadership and coordination function [Ms. Kleinman] had to perform for me? I thought that we had finished the Budget in a timely manner and it was a much smoother process this year. I set up the initial Budget detail volume date table which rolled forward 5 months of the current

year's actual volume, applied growth factors and rates by payer to produce the basis of the 2023 budget. I set up the budget spread methodology for the resulting volumes and revenue. The Salary and Expense portions of the budget were done by [Ms. Kleinman] and I was involved to the extent of inputting data into EPSI. [Ms. Kleinman] said that in my role of budget file development and support, my work produce and files were inaccurate and incomplete and required rework. I do not know which files [she] mean[s]. PS&R Report: I set up an easy link to retrieve these monthly reports from Medicare. The first time I ran it year-to-date and not by month as [Ms. Kleinman] requested. The next month I input it into [Ms. Kleinman's] worksheet without updating some of [her] formulas. I did not understand some of them and chose to wait until I could ask [Ms. Kleinman] at a later time. IAH budget Gross revenue: In doing the Daily Stats for IAH at the beginning of the new fiscal year, I used a budget worksheet which was not the final Budgeted Revenue. I should have obtained it from EPSI. This was corrected mid-month. At VNS I produce the entire budget in great detail and interfaced with all department heads for 15 years. I feel that I have been working in an assistant capacity and have not been involved in the overall plan. There were times when I probably should have asked a question or clarification which may have prevented an error. I enjoy working here and believe I can contribute greatly to the department and take some of the undue pressure off of [Ms. Kleinman]. I have never received a Job description for Budget Manager.

34. Plaintiff believes the other managers of Defendant, including former VNS managers, are much younger than him – approximately in their 30s to 50s.

10

35.    During the creation of the 2023 budget, Plaintiff had changed the "Salary Cost per Visit Reports" in such a way that updating them was much simpler. But Ms. Kleinman and Plaintiff disagreed on some of these changes. She changed the reports several times incorporating some of Plaintiff's changes. During these changes there was confusion at times and errors resulted as they both were working on the same files. In addition, working remotely on laptops caused other problems at times. There were a number of instances when their files were not saved on the network. This caused confusion as to whether a file was updated. Further, Ms. Kleinman's directions during this process were not always clear. Plaintiff believes these factors were the cause of some alleged errors identified in his performance review.

36.    In the course of working on the 2023 budget, Plaintiff was never informed that his work did not meet expectations. Plaintiff was under the impression that they were ahead of schedule in completing the budget. Ms. Kleinman had been doing the budget for many years and he was following her lead as she was his supervisor. Her statement that "[Plaintiff] did not take the lead" on the budget is totally misleading. She established the schedule and had control of the entire process. To the best of Plaintiff's knowledge, he was doing what was expected. Her directions were not always clear. Plaintiff was very surprised and disappointed, especially the comments regarding the budget performance. Plaintiff had no previous indication from her that there was a problem with his performance of the budget functions.

37.    As a result of Plaintiff's review that took place in October 2022, Ms. Kleinman told him that he was going to be put on a PIP, which did not go into effect until December 1, 2022.

38.    As part of the PIP, Plaintiff was scheduled to meet with Ms. Kleinman two times per

week beginning December 1, 2022. The initial meeting included Mark Bramow, from

Human Resources, who is approximately 70 years old. Initially, the issues did not seem

to be too much to overcome. However, most of the meetings were negative in tone. The

emphasis seemed to be on trivial criticisms of something from the previous week.

Plaintiff has a wealth of experience and knowledge in financial reporting and reporting

systems. Plaintiff has superior skills with Microsoft Excel and Microsoft Access. Plaintiff

passed the CPA exam in 1975 and holds an MBA in Finance from St. John's University.

Plaintiff's career has also included teaching several college courses in accounting as a

part-time adjunct professor at Sacred Heart University for six semesters. The criticism in

the PIP reports were intended to ignore Plaintiff's contributions to the reporting function

and exaggerate alleged errors as a means of blaming age as a reason for alleged

"duplication of effort," "fails to double check his work," and "lack of due diligence," etc.

39.    The PIP meetings were not consistent as they took place on December 6 and December 8,

2022, but due to vacations and holidays, they did not meet again until January 3, 2023,

and most Tuesday and Thursdays in January and February 2023.

40.    During one PIP meeting that took place on or about January 31, 2023, Ms. Kleinman

commented: "During meetings, Roger couldn't confirm what version of a report he was

working on, or which report was being referenced." Ms. Kleinman seemed to penalize

Plaintiff for taking time to provide a correct response. The reason for Plaintiff's delayed

response was because once after Ms. Kleinman changed the Salary and Wage Report file,

Plaintiff had later updated it with the new monthly data. She asked Plaintiff if he had

added the new monthly data to the most recent version of the report. For a minute,

Plaintiff had to stop and think if for some reason he had not used the most recent version

12

of the report. Plaintiff then realized that he had, in fact, used the correct version of the report. Her statement that Plaintiff could not confirm what version he was working on was not true. Plaintiff did confirm it after momentary second thoughts. Plaintiff did know what report was being referenced and he told her so. Her comment made it sound like a continuous problem when this misunderstanding happened only **once**. More importantly, it seemed they viewed Plaintiff's delay in responding as being too slow, which is often attributed negatively to age, but he just wanted to confirm that he used the correct version of the report before answering. In the Formal Corrective Action documentation for that meeting she states that this occurred during "meetings." Again, this happened **once**.

41.    On February 22, 2023, Plaintiff informed Ms. Kleinman that he had an appointment with a surgeon early the next morning to discuss his upcoming hernia surgery to be scheduled sometime in March. On February 23, 2023, the next day, Plaintiff told Ms. Kleinman that he needed hernia surgery after his appointment with the surgeon. Plaintiff's surgeon told him he would more than likely not miss more than two days of work. Plaintiff did not submit in any FMLA paperwork, nor did Ms. Kleinman require him to do so. Plaintiff told her the surgery would take place sometime in late March 2023, but no date was set as of yet. Interestingly, she responded that "you can never tell" regarding how long Plaintiff would be out of work. This was a "red flag" to Plaintiff as it seemed clear that she did not believe he would return to work timely following his upcoming surgery.

42.    Plaintiff was not familiar with the FMLA paperwork required by Defendant. Plaintiff does not recall any formal training regarding Defendant's leave policies. Plaintiff did not consider filing it because his surgeon had said that the surgery would not require much recovery time, and he was working from home. More importantly, Ms. Kleinman did not

mention FMLA paperwork and/or Plaintiff's eligibility for leave on February 23, 2023, when he informed her of his surgery scheduled for March 27, 2023, possibly because she knew that he was going to be terminated on February 28, 2023.

43.     On Friday, February 24, 2023, there was a PIP Zoom meeting with Ms. Kleinman and Mr. Bramow. Mr. Bramow started by saying that there was an important Medicare report that Plaintiff was responsible for that Ms. Kleinman had to call Plaintiff about that was almost late. The due date was February 28, 2023. However, Plaintiff completed the report in question on February 22, 2023. Ms. Kleinman called Plaintiff the morning of February 23, 2023, and asked if him it was done it, he told her "Yes," and Plaintiff would save it in the appropriate directory, which he did immediately. She called Plaintiff again late in the afternoon asking him again if it was done. Plaintiff told her he had saved it in their common directory earlier that morning as they had discussed. However, she responded that Plaintiff should have notified her by email. Plaintiff had assumed she had accessed the file immediately after he saved it. Further, Plaintiff had told her that he would save it immediately after their earlier call. At this PIP meeting, Ms. Kleinman and Mr. Bramow told Plaintiff that this was a "Final Warning."

44.     At 3 p.m. on Tuesday, February 28, 2023, only two workdays later, the next PIP Zoom meeting was held. Plaintiff did not expect it to be the last meeting. Mr. Bramow told Plaintiff that they had not seen any improvement and Plaintiff was being discharged effective March 15, 2023, and that his last working day would be that day, February 28, 2023. Plaintiff was blindsided. There was no time between the previous meeting held on Friday, February 24, 2023, and this meeting, the following Tuesday, to show any improvement. Plaintiff responded that he could not believe this. The PIP process was a

sham. The complaints about Plaintiff's work were brought to his attention <u>after</u> the 2023 budget was completed and he was now terminated <u>before</u> the new budget season even began. Plaintiff questioned how he could have been able to show improvement when he did not even make it to the next budget season to do so.

45.    After Mr. Bramow informed Plaintiff that he was being terminated at the Zoom meeting on February 28, 2023, he emailed Plaintiff the Notice of Involuntary Separation, unemployment information, and the Separation and General Release Agreement. Mr. Bramow told Plaintiff that Defendant could send a messenger to his home to pick up the laptop, cell phone, and other property owned by Defendant. Plaintiff said that he would rather drop it off at the office since it is only two miles away. Plaintiff was immediately cut off from his emails, and all files on the laptop, including access to his payroll information. Plaintiff delivered Defendant's property to Jeanne Bodyk, Vice President of Nursing, in the Bridgeport Office and former VNS Vice President for whom Plaintiff had the pleasure of working with at both United and VNS for approximately 33 years. She was under the impression that Plaintiff had retired and wished him a happy retirement. Plaintiff thanked her and did not say anything to the contrary as he was already humiliated by his wrongful termination. Mr. Bramow told Plaintiff to read the Separation and General Release Agreement and consider having an attorney review it before signing.

46.    Upon information and belief, Defendant by and through Ms. Kleinman has assigned a younger person from another department to perform Plaintiff's responsibilities.

47.    Plaintiff's unlawful termination has been devastating financially, professionally, and personally to him. Plaintiff had never come close in over 50 years of his working career to losing his job. Plaintiff is extremely insulted that Defendant chose to terminate him

remotely after he played such an integral part in combining VNS financial records with Defendant's. Plaintiff's role in the combination of the two entities became more important after the resignations of the VNS Vice President of Finance, Ed Nicolas, and the VNS Controller, Ben Mazotas.

48.     The criticisms during Plaintiff's PIP meetings were overstated and misleading. It seemed to Plaintiff that the emphasis in these meeting was to find something in the previous couple days to criticize and use against him to push him out. It is a major insult to be discharged after a career of over 50 years, 33 in homecare. This created much stress in view of Plaintiff's hernia surgery.

49.     On March 7, 2023, Plaintiff went to see his cardiologist because he was experiencing chest pains from the stress of his abrupt and unlawful termination from Defendant. Plaintiff had an abnormal EKG and therefore was sent for a nuclear medicine stress test and a carotid ultrasound.

50.     The hernia surgery took place in Bridgeport Hospital on March 27, 2023. The healing process was successful. However, during that time Plaintiff became very irritable and depressed over having been just unfairly terminated. Plaintiff feels like he still has a lot to offer. The comments made in the Formal Corrective Action reports were highly exaggerated and inaccurate. In Plaintiff's entire career there were no comments of a similar negative nature. As demonstrated in Plaintiff's performance reviews from VNS, he had very positive reviews and his contributions were highlighted and appreciated. In addition, the "exceeds expectations" review by Ms. Kleinman from 2021 was missing from his personnel file.

51.     One additional point Plaintiff would like to mention is it took a long time to receive his

personnel file from Defendant. When it finally arrived, he noted that it had been sent to 11 Soundview instead of 111 Soundview. It was then returned to Defendant, a corrected address label was pasted over the incorrect label and resent. Causing a delay of about one week. Due to his Covid-19 vaccine exemption, Plaintiff was required to test each week for 52 weeks despite working remotely and having no contact with anyone at Defendant at the time. The testing materials were sent to his home address at 111 Soundview, therefore, he questions why his personnel file was sent to the incorrect address when Defendant clearly knew his correct address.

52. The facts set forth above demonstrate that the decision to fire Plaintiff was already made based on age and disability prior to the budget, and the PIP was just a way to justify it. On or about August or September 2022, during one of their department Zoom meetings, Ms. Kleinman was sharing her screen. While she was moving through her screens she stopped for a moment on her e-mails. Plaintiff briefly saw an e-mail to her from David Baranik, Vice President of Finance at HHCAH who is about 65 years old, asking her **"whether or not we have to pay him severance."**

53. Plaintiff did not recall that until recently. The "*him*" Mr. Baranik was referring to was Plaintiff since he was the only male in their small department, which was made up of Ms. Kleinman, Ms. Lugo, and Carmen. Plaintiff does not recall Carmen's last name, but her age is between 55 to 60 years old. Both Ms. Lugo and Carmen, who are younger than Plaintiff, are still employed. Thus, Plaintiff believes that Defendant had already decided to terminate him as early as August 2022 based on his age. That email makes the entire performance related reason for Plaintiff's termination a pretextual sham.

54. Since Plaintiff was mandated to work from home for nearly 3 years he had virtually no

contact with Ms. Kleinman's immediate supervisor, David Baranik, the V.P. of Finance for HHCAH. Plaintiff can only recall meeting Mr. Baranik face to face approximately 3 or 4 times but only in passing. Plaintiff does not recall ever having a conversation with him. Mr. Baranik's opinion of Plaintiff's work could only come from Ms. Kleinman who had regular access to him for years. This is another reason Plaintiff feels he was judged unfairly. Ms. Kleinman's comments on Plaintiff's personnel reviews and PIP do not accurately reflect his long, successful work history.

55. As a result of Plaintiff's unlawful termination and discrimination, he experienced emotional distress, broken sleep patterns, anxiety, irritability, and depression. He feels guilty that he did not address his discrimination and unlawful termination earlier. Plaintiff has sought the professional counseling of a psychiatrist for the psychological effects and emotional damages suffered as a result of this termination. As a result, Plaintiff has been diagnosed with anxiety and depression and he is taking medication to help with the negative effects, which are not only emotional but impact him physically and financially.

56. Plaintiff has been diligently searching for employment since his unlawful termination based on age and disability but has been unable to obtain similar employment.

## CAUSES OF ACTION

### COUNT ONE: AGE DISCRIMINATION IN VIOLATION OF ADEA

57. Plaintiff repeats and realleges the allegations of Paragraphs 1 through 56, as if fully set forth herein.

58. Plaintiff was an experienced and high performing financial professional who was at all relevant times highly qualified for his position and performing at a high level of competence notwithstanding the pretextual reasons given for his termination.

18

59.    Throughout his employment with Defendant, Plaintiff was intentionally subjected to unequal treatment and to a series of continuous adverse employment actions on account of his age.

60.    Plaintiff was repeatedly treated differently than his similarly situated younger coworkers including but not limited to:

    a.    On or about August or September 2022, during one of his department's Zoom meetings, Ms. Kleinman was sharing her screen. While she was moving through her screens she stopped for a moment on her e-mails. Plaintiff briefly saw an e-mail to her from David Baranik, Vice President of Finance at HHCAH, asking her "whether or not we have to pay *him* severance." (emphasis added). Plaintiff believes the "him" that Mr. Baranik was referring to was Plaintiff since he was the only male in his small department. Thus, Defendant had already decided to terminate Plaintiff as early as August 2022;

    b.    Being underutilized as if Defendant did not want to give him more responsibilities because they knew he would not be there much longer although he had no intention to retire. By September 2022, his office in Bridgeport was given away and he was relegated to a secretarial desk. He felt isolated from any of the operations, unlike his time with VNS (prior employer before Defendant took over) where he worked with the operating managers on a daily basis;

    c.    Receiving a performance review of "Does Not Meet Expectations" from Ms. Kleinman without cause. Plaintiff was told that this was due to alleged errors in certain monthly reports and that "[He] did not take the lead in the budget

process." This clearly was not indicative of Plaintiff's many years of excellent performance. Plaintiff was not informed of any issues or warnings of poor performance prior;

d.   There was little or no opportunity to "show the capability to lead" a meeting with other managers during the 2023 budget season as Plaintiff was not invited to most of these meetings (remote zoom meetings), if any. Further, Ms. Kleinman had been doing the budget for many years and scheduled all of the budget meetings with the other departments of Defendant. She had developed all the formats and spreadsheets used in accumulating the budget over the years;

e.   Both Plaintiff and Ms. Kleinman changed the reports several times. During these changes there was confusion at times and errors resulted as they both were working on the same files. In addition, working remotely on laptops caused other problems at times. There were a number of instances when their files were not saved on the network. This caused confusion as to whether a file was updated. Further, Ms. Kleinman's directions during this process were not always clear. Plaintiff did everything that was asked of him in producing the budget;

f.   As a result, Plaintiff was placed on a sham Performance Improvement Program ("PIP"), which was merely used to paper his personnel file to justify his termination based on age that was already decided back in August 2022;

g.   As part of the PIP, Plaintiff was scheduled to meet with Ms. Kleinman two times per week beginning December 1, 2022. However, the PIP meetings

were not consistent as they took place on December 6 and December 8, 2022, but did not meet again until January 3, 2023, and most Tuesday and Thursdays in January and February 2023;

h.  Most of the meetings were negative in tone focusing on trivial criticisms from the previous week;

i.  For one PIP meeting, Ms. Kleinman commented: "During meetings, [Plaintiff] couldn't confirm what version of a report he was working on, or which report was being referenced." Ms. Kleinman seemed to penalize Plaintiff for taking time to provide a correct response. When in fact, he paused to make sure he used the correct most recent report. Further, this only happened once. The criticism in the PIP reports were blatantly false and intended to ignore Plaintiff's contributions to the reporting function and exaggerate alleged errors as a means of blaming age as a reason for alleged "duplication of effort," "fails to double check his work," and "lack of due diligence." Such criticism was clearly fabricated and out of character for Mr. Moscater based on his prior performance;

j.  On Friday, February 24, 2023, there was a PIP Zoom meeting with Ms. Kleinman and Mark Bramow, from Human Resources. Plaintiff received a "Final Warning" because Ms. Kleinman had to call him about an important Medicare report that was allegedly but not actually almost late. The due date was February 28, 2023. However, Plaintiff had completed the report in question on February 22, 2023;

k.  Then, at 3 PM on Tuesday, February 28, 2023, only two workdays later, the

21

next PIP Zoom meeting was held with Ms. Kleinman and Mr. Bramow, which turned out to be Plaintiff's termination meeting. Mr. Bramow informed Plaintiff that they had not seen any improvement and that he was being discharged effective March 15, 2023. Plaintiff's last working day would be that day, February 28, 2023. There was no time between the previous meeting held on Friday, February 24, 2023, and this meeting, the following Tuesday, to show any improvement. The PIP process was a sham. The complaints about Plaintiff's work were brought to his attention <u>after</u> the 2023 budget was completed and he was now terminated <u>before</u> the new budget season even began;

l. Defendant's managers, including former VNS managers, are much younger than Plaintiff – approximately in their 30s to 50s;

m. The other two younger women in Plaintiff's small department, Ms. Lugo and Carmen, who are younger than Plaintiff, are still employed;

n. Veronica Lugo and Plaintiff had many conversations about working for Ms. Kleinman. Plaintiff asked Ms. Lugo several times if she had problems understanding Ms. Kleinman's instructions as his experience was that her instructions were not always clear. Ms. Lugo confirmed that she did also. There were times when Plaintiff thought he was following Ms. Kleinman's instructions and later found out that was not what she intended. Ms. Lugo had many similar experiences. While Plaintiff was terminated, Ms. Lugo is still employed;

o. Ms. Kleinman is having someone younger than Plaintiff from another

department perform Plaintiff's responsibilities.

61. Defendant's conduct, by and through its agents and employees, in treating the Plaintiff in a manner unequal to other younger employees as described above, discriminatorily denied Plaintiff equal treatment on the basis of age in violation of the ADEA.

62. The discriminatory acts of Defendant as described above were intentional and were motivated on the basis of Plaintiff's age.

63. The Defendant's proffered legitimate non-discriminatory reason for termination, i.e., Plaintiff's alleged poor performance, is false and pretextual and in itself, raises an obvious inference of age discrimination.

64. As a result of Defendant's conduct, Plaintiff has suffered and will continue to suffer damages and losses including, but not limited to, reputational harm, lost wages, lost employment benefits, emotional distress, and Plaintiff has incurred and will continue to incur attorney's fees, expenses, and costs.

## COUNT TWO: AGE DISCRIMINATION UNDER CFEPA

65. Plaintiff repeats and realleges the allegations of Paragraphs 1 through 64, as if fully set forth herein.

66. Plaintiff was at all relevant times a highly qualified and competent employee of Defendant, and a covered person pursuant to the Connecticut Fair Employment Practices Act (hereinafter, "CFEPA"), § 46a-60, *et seq*.

67. Plaintiff was an experienced and high performing financial professional who was at all relevant times highly qualified for his position and performing at a high level of competence notwithstanding the pretextual reasons given for his termination.

68. Throughout his employment with Defendant, Plaintiff was intentionally subjected to

unequal treatment and to a series of continuous adverse employment actions on account of his age.

69.    Plaintiff was repeatedly treated differently than his similarly situated younger coworkers including but not limited to:

a.    On or about August or September 2022, during one of his department's Zoom meetings, Ms. Kleinman was sharing her screen. While she was moving through her screens she stopped for a moment on her e-mails. Plaintiff briefly saw an e-mail to her from David Baranik, Vice President of Finance at HHCAH, asking her "whether or not we have to pay *him* severance." (emphasis added). Plaintiff believes the "him" that Mr. Baranik was referring to was Plaintiff since he was the only male in his small department. Thus, Defendant had already decided to terminate Plaintiff as early as August 2022;

b.    Being underutilized as if Defendant did not want to give him more responsibilities because they knew he would not be there much longer although he had no intention to retire. By September 2022, his office in Bridgeport was given away and he was relegated to a secretarial desk. He felt isolated from any of the operations, unlike his time with VNS (prior employer before Defendant took over) where he worked with the operating managers on a daily basis;

c.    Receiving a performance review of "Does Not Meet Expectations" from Ms. Kleinman without cause. Plaintiff was told that this was due to alleged errors in certain monthly reports and that "[He] did not take the lead in the budget process." This clearly was not indicative of Plaintiff's many years of excellent

performance. Plaintiff was not informed of any issues or warnings of poor performance prior;

d.   There was little or no opportunity to "show the capability to lead" a meeting with other managers during the 2023 budget season as Plaintiff was not invited to most of these meetings (remote zoom meetings), if any. Further, Ms. Kleinman had been doing the budget for many years and scheduled all of the budget meetings with the other departments of Defendant. She had developed all the formats and spreadsheets used in accumulating the budget over the years;

e.   Both Plaintiff and Ms. Kleinman changed the reports several times. During these changes there was confusion at times and errors resulted as they both were working on the same files. In addition, working remotely on laptops caused other problems at times. There were a number of instances when their files were not saved on the network. This caused confusion as to whether a file was updated. Further, Ms. Kleinman's directions during this process were not always clear. Plaintiff did everything that was asked of him in producing the budget;

f.   As a result, Plaintiff was placed on a sham Performance Improvement Program ("PIP"), which was merely used to paper his personnel file to justify his termination based on age that was already decided back in August 2022;

g.   As part of the PIP, Plaintiff was scheduled to meet with Ms. Kleinman two times per week beginning December 1, 2022. However, the PIP meetings were not consistent as they took place on December 6 and December 8, 2022,

but did not meet again until January 3, 2023, and most Tuesday and Thursdays in January and February 2023;

h.  Most of the meetings were negative in tone focusing on trivial criticisms from the previous week;

i.  For one PIP meeting, Ms. Kleinman commented: "During meetings, [Plaintiff] couldn't confirm what version of a report he was working on, or which report was being referenced." Ms. Kleinman seemed to penalize Plaintiff for taking time to provide a correct response. When in fact, he paused to make sure he used the correct most recent report. Further, this only happened once. The criticism in the PIP reports were blatantly false and intended to ignore Plaintiff's contributions to the reporting function and exaggerate alleged errors as a means of blaming age as a reason for alleged "duplication of effort," "fails to double check his work," and "lack of due diligence." Such criticism was clearly fabricated and out of character for Plaintiff based on his prior performance;

j.  On Friday, February 24, 2023, there was a PIP Zoom meeting with Ms. Kleinman and Mark Bramow, from Human Resources. Plaintiff received a "Final Warning" because Ms. Kleinman had to call him about an important Medicare report that was allegedly almost late. The due date was February 28, 2023. However, Plaintiff had completed the report in question on February 22, 2023;

k.  Then, at 3 PM on Tuesday, February 28, 2023, only two workdays later, the next PIP Zoom meeting was held with Ms. Kleinman and Mr. Bramow, which

turned out to be Plaintiff's termination meeting. Mr. Bramow informed Plaintiff that they had not seen any improvement and that he was being discharged effective March 15, 2023. Plaintiff's last working day would be that day, February 28, 2023. There was no time between the previous meeting held on Friday, February 24, 2023, and this meeting, the following Tuesday, to show any improvement. The PIP process was a sham. The complaints about Plaintiff's work were brought to his attention <u>after</u> the 2023 budget was completed and he was now terminated <u>before</u> the new budget season even began;

l.  Defendant's managers, including former VNS managers, are much younger than Plaintiff – approximately in their 30s to 50s;

m.  The other two younger women in Plaintiff's small department, Ms. Lugo and Carmen, who are younger than Plaintiff, are still employed;

n.  Veronica Lugo and Plaintiff had many conversations about working for Ms. Kleinman. Plaintiff asked Ms. Lugo several times if she had problems understanding Ms. Kleinman's instructions as his experience was that her instructions were not always clear. Ms. Lugo confirmed that she did also. There were times when Plaintiff thought he was following Ms. Kleinman's instructions and later found out that was not what she intended. Ms. Lugo had many similar experiences. While Plaintiff was terminated, Ms. Lugo is still employed;

o.  Ms. Kleinman is having someone younger from another department perform Plaintiff's responsibilities.

70.    Defendant's conduct, by and through its agents and employees, in treating the Plaintiff in a manner unequal to other employees as described above, discriminatorily denied Plaintiff equal treatment on the basis of age in violation of the CFEPA.

71.    The discriminatory acts of Defendant as described above were intentional and were motivated on the basis of Plaintiff's age.

72.    The Defendant's proffered legitimate non-discriminatory reason for termination, i.e., Plaintiff's alleged poor performance, is false and pretextual and in itself raises an obvious inference of age discrimination.

73.    As a result of Defendant's conduct, Plaintiff has suffered and will continue to suffer damages and losses including, but not limited to, reputational harm, lost wages, lost employment benefits, emotional distress, and Plaintiff has incurred and will continue to incur attorney's fees, expenses, and costs.

## COUNT THREE: DISABILITY DISCRIMINATION AND RETALIATION IN VIOLATION OF THE ADA

74.    Plaintiff repeats and realleges the allegations of Paragraphs 1 through 73, as if fully set forth herein.

75.    Plaintiff is and was at all relevant times an individual who is disabled within the meaning of the ADA in that he has ischemic heart disease caused by Agent Orange exposure in Vietnam leading to a stent placement, renal insufficiency, diabetes, hypertension, hyperlipidemia, and hyperthyroidism as a result, which have been confirmed by the Veterans Administration that substantially limit one or more major life activities, he has a record of such impairments, and records of which are in his personnel file. Plaintiff had two heart attacks, the first in 2006 and the second in 2008 while working for VNS due to his ischemic heart disease. He was on FMLA leave both times. The FMLA leave for

those illnesses is documented in his personnel file, so Defendant had notice of his
conditions.

76.     At all relevant times Plaintiff was well qualified to perform the essential functions of his
        job as Budget Manager, with or without accommodations. He performed all of his duties
        well and was extremely well qualified for his position. He has had extensive training and
        experience in the home healthcare industry, specifically its financial functions.

77.     Plaintiff suffered adverse employment action because of his disability or perceived
        disability including but not limited to being terminated just days after informing Ms.
        Kleinman that he required hernia surgery and would need a few days off.

78.     On February 23, 2023, Plaintiff notified Ms. Kleinman he would need hernia surgery.
        Plaintiff told Ms. Kleinman that the surgery would take place sometime in late March
        2023, but no date was set as yet, but that he would likely not miss more than two days of
        work. She responded that "you can never tell" regarding how long he would be out of
        work. Plaintiff was not familiar with the FMLA paperwork required by Defendant.
        Further, Ms. Kleinman did not mention FMLA paperwork when Plaintiff informed her of
        his surgery. FMLA leave would have provided Plaintiff with temporary job protection
        which would interfere in her plan to terminate him based on his disabilities as he was
        likely to need some time off from work.

79.     The next day, February 24, 2023, after notifying Ms. Kleinman of his hernia surgery,
        Plaintiff was given a "Final Warning" for not emailing Ms. Kleinman that he had upload
        a Medicare report to their common directory despite telling her that he would save it
        immediately after their call.

80.     Then, the following Tuesday, only three workdays since Plaintiff informed Ms. Kleinman

of his surgery, Plaintiff was terminated because Defendant allegedly did not see any improvement.

81. The adverse employment actions taken against Plaintiff as described herein above were substantially motivated by the discriminatory animus of Defendant, by and through its employees, based on Plaintiff's actual and perceived disabilities.

82. Defendant cannot provide a legitimate, non-discriminatory reason for these adverse actions taken against Plaintiff. Any excuse proffered by Defendant is not legitimate and is merely a pretext for discrimination based on Plaintiff's actual or perceived disability.

83. Defendant's willful and premeditated termination decision in this case was pretextual and not legitimate and is the cause of Plaintiff's damages, as described herein, for which the Plaintiff seeks redress.

84. The Defendant's proffered legitimate non-discriminatory reason for termination, i.e., Plaintiff's alleged poor performance, is false and pretextual and in itself raises an obvious inference of disability discrimination.

85. As a result of Defendant's conduct, Plaintiff has suffered and will continue to suffer damages and losses including, but not limited to, reputational harm, lost wages, lost employment benefits, emotional distress, and Plaintiff has incurred and will continue to incur attorney's fees, expenses, and costs.

**COUNT FOUR: DISABILITY DISCRIMINATION IN VIOLATION OF THE CFEPA**

86. Plaintiff repeats the allegations of Paragraphs 1 through 85, as if fully set forth herein.

87. The Plaintiff is and was at all relevant times an individual who is disabled within the meaning of the CFEPA in that he has ischemic heart disease caused by Agent Orange exposure in Vietnam leading to a stent placement, renal insufficiency, diabetes,

hypertension, hyperlipidemia, and hyperthyroidism as a result, which have been confirmed by the Veterans Administration that substantially limit one or more major life activities, he has a record of such impairments, and records of which are in his personnel file. Plaintiff had two heart attacks, the first in 2006 and the second in 2008 while working for VNS due to his ischemic heart disease. He was on FMLA leave both times. The FMLA leave for those illnesses is documented in his personnel file, so Defendant had notice of his conditions.

88.     Defendant is covered by the CFEPA and is subject to its mandates.

89.     At all relevant times Plaintiff was well qualified to perform the essential functions of his job as Budget Manager, with or without accommodations. He performed all of his duties well and was extremely well qualified for his position. He has had extensive training and experience in the home healthcare industry, specifically its financial functions.

90.     Plaintiff suffered adverse employment action because of his disability or perceived disability including but not limited to being terminated just days after informing Ms. Kleinman that he required hernia surgery and would need a few days off.

91.     On February 23, 2023, Plaintiff notified Ms. Kleinman he would need hernia surgery. Plaintiff told Ms. Kleinman that the surgery would take place sometime in late March 2023, but no date was set as yet, but that he would likely not miss more than two days of work. She responded that "you can never tell" regarding how long he would be out of work. Plaintiff was not familiar with the FMLA paperwork required by Defendant. Further, Ms. Kleinman did not mention FMLA paperwork when Plaintiff informed her of his surgery. FMLA leave would have provided Plaintiff with temporary job protection which would interfere in her plan to terminate him based on his disabilities as he was

likely to need some time off from work.

92.    The next day, February 24, 2023, after notifying Ms. Kleinman of his hernia surgery, Plaintiff was given a "Final Warning" for not emailing Ms. Kleinman that he had upload a Medicare report to their common directory despite telling her that he would save it immediately after their call.

93.    Then, the following Tuesday, only three workdays since Plaintiff informed Ms. Kleinman of his surgery, Plaintiff was terminated because Defendant allegedly did not see any improvement.

94.    The adverse employment actions taken against Plaintiff as described herein above were substantially motivated by the discriminatory animus of Defendant, by and through its employees, based on Plaintiff's actual and perceived disabilities.

95.    Defendant cannot provide a legitimate, non-discriminatory reason for these adverse actions taken against Plaintiff. Any excuse proffered by Defendant is not legitimate and is merely a pretext for discrimination based on Plaintiff's actual or perceived disability.

96.    The Defendant's proffered legitimate non-discriminatory reason for termination, i.e., Plaintiff's alleged poor performance, is false and pretextual and in itself raises an obvious inference of disability discrimination.

97.    Defendant's willful and premeditated termination decision in this case was pretextual and not legitimate and is the cause of Plaintiff's damages, as described herein, for which the Plaintiff seeks redress.

98.    As a result of Defendant's conduct, Plaintiff has suffered and will continue to suffer damages and losses including, but not limited to, reputational harm, lost wages, lost employment benefits, emotional distress, and Plaintiff has incurred and will continue to

incur attorney's fees, expenses, and costs.

## COUNT FIVE: INTERFERENCE AND RETALIATION IN VIOLATION OF THE FMLA

99.     Plaintiff repeats and realleges the allegations of Paragraphs 1 through 98, as if fully set forth herein.

100.    Plaintiff was at all relevant times a highly qualified and competent employee of Defendant.

101.    Plaintiff was at all relevant times eligible to take FMLA leave.

102.    Defendant failed to advise Plaintiff of his FMLA rights and the lack of notice caused Plaintiff to forfeit his FMLA leave, which constitutes unlawful FMLA interference.

103.    Plaintiff informed his supervisor, Ms. Kleinman, of his need for hernia surgery and Defendant was notified of his serious medical conditions, and further, he notified them that he needed time out for the surgery and intended to take that time to recover. Thus, obviously, Defendant was fully aware that Plaintiff was an individual who would have been qualified to utilize FMLA leave. Defendant did not inform Plaintiff of his FMLA rights. In fact, Ms. Kleinman questioned Plaintiff regarding whether he would actually return by the date he said he would, which was merely after two days. Further, Defendant did not provide any training to advise Plaintiff of his FMLA rights as well as notice of its FMLA procedures. As a result, Plaintiff forfeited his FMLA leave.

104.    Plaintiff suffered termination which is an adverse employment action under circumstances giving rise to an inference of retaliatory intent for attempted use of his FMLA rights.

105.    Defendant chose to terminate Plaintiff after his request for medical leave but before he had time or even realized he could exercise a FMLA request for his surgery.

106. Defendant's proffered legitimate non-retaliatory reason for termination, i.e., Plaintiff's alleged poor performance, is false and pretextual and in itself raises an obvious inference of FMLA retaliation.

107. As a result of Defendant's conduct, Plaintiff has suffered and will continue to suffer damages and losses including, but not limited to, reputational harm, lost wages, lost employment benefits, emotional distress, and Plaintiff has incurred and will continue to incur attorney's fees, expenses, and costs.

## COUNT SIX: INTERFERENCE AND RETALIATION IN VIOLATION OF THE CTFMLA

108. Plaintiff repeats and realleges the allegations of Paragraphs 1 through 107, as if fully set forth herein.

109. Plaintiff was at all relevant times a highly qualified and competent employee of Defendant.

110. Plaintiff was at all relevant times eligible to take CTFMLA leave.

111. Defendant failed to advise Plaintiff of his CTFMLA rights and the lack of notice caused Plaintiff to forfeit his CTFMLA leave, which constitutes unlawful CTFMLA interference.

112. Plaintiff informed his supervisor, Ms. Kleinman, of his need for hernia surgery and Defendant was notified of his serious medical conditions, and further, he notified them that he needed time out for the surgery and intended to take that time to recover. Thus, obviously, Defendant was fully aware that Plaintiff was an individual who would have been qualified to utilize CTFMLA leave. Defendant did not inform Plaintiff of his CTFMLA rights. In fact, Ms. Kleinman questioned Plaintiff regarding whether he would actually return by the date he said he would, which was merely after two days. Further, Defendant did not provide any training to advise Plaintiff of his CTFMLA rights as well

34

as notice of its CTFMLA procedures. As a result, Plaintiff forfeited his CTFMLA leave.

113. Plaintiff suffered termination which is an adverse employment action under circumstances giving rise to an inference of retaliatory intent for use of his CTFMLA rights.

114. Defendant chose to terminate Plaintiff after his request for medical leave but before he had time or even realized he could exercise a CTFMLA request for his surgery.

115. Plaintiff suffered loss of wages, loss of benefits, loss of career opportunities, damage to his reputation, loss of status and inability to locate suitable replacement employment, all to his loss and damage.

116. As a result of Defendant's conduct, Plaintiff has suffered and will continue to suffer damages and losses including, but not limited to, reputational harm, lost wages, lost employment benefits, emotional distress, and Plaintiff has incurred and will continue to incur attorney's fees, expenses, and costs.

**COUNT SEVEN: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

117. Plaintiff repeats and realleges the allegations of Paragraphs 1 through 116, as if fully set forth herein.

118. The actions of Defendant as set forth above, including the acts of discrimination, were intentional, reckless and wanton and were committed in order to cause emotional harm to the Plaintiff including without limitation:

   a. Being put on a sham PIP. The PIP process was a sham and Plaintiff was being targeted to be pushed out. As stated above, Defendant already determined they would terminate Plaintiff as early as August 2022;

   b. Further, Plaintiff's abrupt termination before his hernia surgery led to chest

pains and he had to undergo a nuclear medicine stress test and a carotid ultrasound due to an abnormal EKG. Plaintiff's termination did not only result in the loss of his job but in the loss of his life insurance and other employment benefits (including short term and long term disability) right before his hernia surgery. Understandably, Plaintiff was extremely concerned of the outcome given his existing health conditions and additional stress. After his many years of dedicated hard work, for Defendant to take away key benefits that would provide him and his family a safety net in the event that undergoing surgery as a 77 years old disabled veteran did not go well was inhumane;

c. Now, at 78 years old, Plaintiff is without a job and experiences the profound physical, financial, and emotional impacts of his termination daily.

119.  In taking the actions against Plaintiff as aforesaid, Defendant intended to inflict emotional distress or it knew or should have known that emotional distress was the likely result of its conduct.

120.  The conduct of Defendant in this case was extreme and outrageous in that fabricating performance issues to justify an unwarranted termination is itself extreme and outrageous and was the cause of Plaintiff's distress.

121.  The emotional distress sustained by Plaintiff was severe.

122.  As a direct result of Defendant's intentional actions, Plaintiff suffered emotional distress and broken sleep patterns, anxiety, irritability, cardiac issues, and depression. Plaintiff feels guilt that he did not address his discrimination and unlawful termination earlier. He sought the professional counseling of a psychiatrist for the psychological effects and emotional damages suffered as a result of this termination. As a result, he was diagnosed

with anxiety and depression and is taking medication to help with the negative effects, which are not only emotional but impact him physically and financially, all to his loss and damage.

**COUNT EIGHT: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

123.    Plaintiff repeats and realleges the allegations of Paragraphs 1 through 122, as if fully set forth herein.

124.    As set forth above, Defendant's conduct in the sham performance termination process created an unreasonable risk of causing Plaintiff emotional distress and did in fact cause such distress.

125.    Plaintiff's distress in the termination process was foreseeable by Defendant and the emotional distress was severe enough that it might result in illness or bodily harm to Plaintiff.

126.    Defendant's conduct as set forth above was the cause of Plaintiff's distress.

127.    Defendant breached its duty of ordinary care in its misconduct towards Plaintiff as aforesaid.

128.    As a direct result of Defendant's negligent and careless actions in the course of its sham termination process, Plaintiff suffered emotional distress and broken sleep patterns, anxiety, irritability, cardiac issues, and depression. Plaintiff feels guilt that he did not address his discrimination and unlawful termination earlier. He sought the professional counseling of a psychiatrist for the psychological effects and emotional damages suffered as a result of this termination. As a result, he was diagnosed with anxiety and depression and is taking medication to help with the negative effects, which are not only emotional but impact him physically and financially, all to his loss and damage.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests the following relief:

(a)  Award compensatory damages;

(b)  Award back pay;

(c)  Award front pay in lieu of reinstatement;

(d)  Award punitive damages for intentional conduct;

(e)  Award attorneys' fees and costs;

(f)  Award pre-judgement interest;

(g)  Award post-judgement interest; and

(h)  Award such other relief in law or equity as this Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all questions of fact raised by his Complaint.

Respectfully submitted,

PLAINTIFF
ROGER MOSCATER

By: __/s/_____
    Christopher S. Avcollie (ct29034)
    Carey & Associates, P.C.
    71 Old Post Road, Suite 1
    Southport, CT 06890
    (203) 255-4150 tel.
    (203) 255-0380 fax
    mcarey@capclaw.com
    *His Attorneys*

**EXHIBIT A**

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

**Boston Area Office**
15 New Dudbury St, Room 475
Boston, MA 02203
(617) 865-3670
Website:  www.eeoc.gov

## <u>DETERMINATION AND NOTICE OF RIGHTS</u>
### (This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 02/29/2024

**To:** Roger Moscater
111 Soundview Avenue
Fairfield, CT 06825
Charge No: 523-2024-00220

EEOC Representative and email:    NICHOLAS FULLER
Equal Opportunity Investigator
nicholas.fuller@eeoc.gov

---

### DETERMINATION OF CHARGE

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign in to the EEOC Public Portal and upload the court complaint to charge 523-2024-00220.

On behalf of the Commission,

```
Digitally Signed By:Feng K. An
02/29/2024
```

Feng K. An
Area Office Director

**Cc:**
Peter J Murphy
SHIPMAN & GOODWIN LLP
1 CONSTITUTION PLZ FL 16
Hartford, CT 06103

Genevieve  Lage
Carey & Associates, P.C.
71 Old Post Road Suite 1
Southport, CT 06890

Christopher Avcollie
Carey & Associates, P.C.
71 OLD POST ROAD, SUITE ONE
Southport, CT 06890


Please retain this notice for your records.

# INFORMATION RELATED TO FILING SUIT
# UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court **under Federal law**. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

## IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* this Notice**. Receipt generally means the date when you (or your representative) opened this email or mail. You should **keep a record of the date you received this notice**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving it (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA, the ADEA, or the PWFA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA, the ADEA or the PWFA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of this Notice and within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

## ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

## HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a Freedom of Information Act (FOIA) request or 2) a "Section 83" request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of this notice, please submit your FOIA and/or Section 83 request for the charge file promptly to allow sufficient time for EEOC to respond and for your review.

**To make a FOIA request for your charge file**, submit your request online at https://eeoc.arkcase.com/foia/portal/login (this is the preferred method). You may also submit a FOIA request for your charge file by U.S. Mail by submitting a signed, written request identifying your request as a "FOIA Request" for Charge Number 523-2024-00220 to the

Enclosure with EEOC Notice of Closure and Rights (01/22)

District Director at Yaw Gyebi, Jr., 33 Whitehall St 5th Floor, New York, NY 10004.

**To make a Section 83 request for your charge file**, submit a signed written request stating it is a "Section 83 Request" for Charge Number 523-2024-00220 to the District Director at Yaw Gyebi, Jr., 33 Whitehall St 5th Floor, New York, NY 10004.

You may request the charge file up to 90 days after receiving this Notice of Right to Sue. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA requests, go to https://www.eeoc.gov/eeoc/foia/index.cfm.

For more information on submitted Section 83 requests, go to https://www.eeoc.gov/foia/section-83-disclosure-information-charge-files.

### NOTICE OF RIGHTS UNDER THE ADA AMENDMENTS ACT OF 2008 (ADAAA)

The ADA was amended, effective January 1, 2009, to broaden the definitions of disability to make it easier for individuals to be covered under the ADA/ADAAA. A disability is still defined as (1) a physical or mental impairment that substantially limits one or more major life activities (actual disability); (2) a record of a substantially limiting impairment; or (3) being regarded as having a disability. *However, these terms are redefined, and it is easier to be covered under the new law.*

If you plan to retain an attorney to assist you with your ADA claim, we recommend that you share this information with your attorney and suggest that he or she consult the amended regulations and appendix, and other ADA related publications, available at: http://www.eeoc.gov/laws/types/disability_regulations.cfm.

**"Actual" disability or a "record of" a disability**

If you are pursuing a failure to accommodate claim you must meet the standards for either "actual" or "record of" a disability:

- **The limitations from the impairment no longer must be severe or significant** for the impairment to be considered substantially limiting.

- In addition to activities such as performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, thinking, concentrating, reading, bending, and communicating (more examples at 29 C.F.R. § 1630.2(i)), **"major life activities" now include the operation of major bodily functions**, such as: functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions; or the operation of an individual organ within a body system**.**

- **Only one** major life activity need be substantially limited.

- Except for ordinary eyeglasses or contact lenses, the beneficial effects of **"mitigating measures"** (e.g., hearing aid, prosthesis, medication, therapy, behavioral modifications) **are not considered** in determining if the impairment substantially limits a major life activity.

 An impairment that is **"episodic"** (e.g., epilepsy, depression, multiple sclerosis) or "**in remission**" (e.g., cancer) is a disability if it **would be substantially limiting when active**.

 An impairment **may be substantially limiting even though** it lasts or is expected to last **fewer than six months**.

**"Regarded as" coverage**

An individual can meet the definition of disability if an **employment action was taken because of an actual or perceived impairment** (e.g., refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment).

 "Regarded as" coverage under the ADAAA no longer requires that an impairment be substantially limiting, or that the employer perceives the impairment to be substantially limiting.

 The employer has a defense against a "regarded as" claim only when the impairment at issue is objectively **both** transitory (lasting or expected to last six months or less) **and** minor.

 A person is not able to bring a failure to accommodate claim **if** the individual is covered only under the "regarded as" definition of "disability".

***Note:*** *Although the amended ADA states that the definition of disability "shall be construed broadly" and "should not demand extensive analysis," some courts require specificity in the complaint explaining how an impairment substantially limits a major life activity or what facts indicate the challenged employment action was because of the impairment. Beyond the initial pleading stage, some courts will require specific evidence to establish disability.* For more information, consult the amended regulations and appendix, as well as explanatory publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.

**EXHIBIT B**

# STATE OF CONNECTICUT
# COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

Roger W. Moscater

**COMPLAINANT**

CHRO No. 2420139

vs.

Hartford Healthcare Corporation

**RESPONDENT**

## RELEASE OF JURISDICTION

The Commission on Human Rights and Opportunities hereby releases its jurisdiction over the above-identified complaint. The Complainant is authorized to commence a civil action in accordance with CONN. GEN. STAT. § 46a-100 against the Respondent in the Superior Court for the judicial district in which the discriminatory practice is alleged to have occurred, in which the Respondent transacts business or in which the Complainant resides. If this action involves a state agency or official, it may be brought in the Superior Court for the judicial district of Hartford.

A copy of any civil action brought pursuant to this release must be served on the Commission at ROJ@ct.gov or at 450 Columbus Blvd., Suite 2, Hartford, CT 06103 at the same time all other parties are served. Electronic service is preferred. **THE COMMISSION MUST BE SERVED BECAUSE IT HAS A RIGHT TO INTERVENE IN ANY ACTION BASED ON A RELEASE OF JURISDICTION PURSUANT TO CONN. GEN. STAT. § 46a-103.**

The Complainant must bring an action in Superior Court within 90 days of receipt of this release and within two years of the date of filing the complaint with the Commission unless circumstances tolling the statute of limitations are present.

_Tanya A Hughes_

**DATE:** April 3, 2024

Tanya A. Hughes, Executive Director

Service:
**Complainant's Attorney**: Christopher S. Avcollie, Esq. (Via Email – cavocollie@capclaw.com)
**Respondent's Attorney:** Peter J. Murphy, Esq. (Via Email – pjmurphy@goodwin.com)